# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

NORTH STAR MUTUAL INSURANCE
COMPANY,

        Plaintiff/Counter-
        Defendant,

vs.

THOMAS W. LIPPS,

        Defendant/Counter-
        Claimant.

Case No. 20-CV-3042-KEM

**MEMORANDUM OPINION
AND ORDER**

_____

      Defendant Thomas Lipps moves for summary judgment on Plaintiff North Star Mutual Insurance Co.'s legal malpractice claim against him. Lipps argues that North Star cannot prove proximate cause or damages since it settled the underlying lawsuit against it very quickly without conducting any discovery; Lipps also argues that North Star cannot recover corrective attorney's fees. I disagree and, accordingly, **deny** Lipps's motion for summary judgment (Doc. 37).

## I.    BACKGROUND[1]

      The facts in this section are stated in the light most favorable to Plaintiff North Star, the nonmoving party. In December 2017, Ehrich Pakala completed an application

---

[1] Unless otherwise noted, the facts in this section are taken from the admitted statements in Defendant's Statement of Facts (Docs. 37-1, 41-2), and Plaintiff's Statement of Additional Facts (Doc. 41-3), to which Defendant did not respond. *See* LR 56(d) (providing that the moving party must "file a reply in which the moving party expressly admits, denies, or qualifies" each additional statement of fact and that "[t]he failure to reply to an individual statement of material fact with appropriate appendix citations may constitute an admission of that fact").

for home insurance through North Star. The application asked whether any insurer had ever canceled, declined, or refused to provide Pakala home insurance. In response, Pakala wrote: "Packaged company, auto cancelled, so home followed." North Star issued a home insurance policy to Pakala, effective December 23, 2017. Less than two weeks later, on December 31, 2017, the heating system in Pakala's home failed, causing the water pipes to freeze and burst. Pakala submitted a claim to North Star for the resulting water damage.

North Star discovered that Pakala's prior insurance company decided not to renew his policy because of "unacceptable signs of excessive deterioration to the siding with paint chipping and also some rotting," as well as a missing stairwell handrail. *See* Def. App. 23-25. [2] North Star hired Defendant Lipps, an attorney, to determine if North Star could legally cancel the policy. Lipps opined that under Iowa Code § 515.129A,[3] as well as the policy's terms, North Star could rescind the policy based on a material misrepresentation Pakala made in his application related to the reasons he had lost his prior home insurance.

After receiving Lipps's opinion letter, North Star sent a letter to Pakala on February 7, 2018, voiding his insurance policy. The letter suggested Pakala misrepresented the reasons he had lost home insurance in his application to North Star. *See* Def. App. 25. It further stated, "Had North Star known the actual reason for the non-renewal, it would not have bound coverage. North Star . . . [u]nderwriting guidelines do not allow binding coverage on policies that non-renew by another carrier." *Id.* North Star refunded Pakala his premium and closed his claim. *Id.*

---

[2] "Def. App." refers to the Defendant's Appendix, filed at Doc. 37-3.

[3] That section provides that when an insurance policy has been in effect for sixty days or more, an insurance company may only cancel a policy for certain reasons, including "[d]iscovery of fraud or material misrepresentation made by or with the knowledge of the named insured in obtaining . . . the policy." **Iowa Code § 515.129A(1), (2)(c)**.

2

Pakala eventually hired a lawyer. In August 2019, Pakala's lawyer wrote to North Star, stating that North Star owed Pakala for the water damage based on Iowa Code § 515.133. *See* Def. App. 22. That provision states that upon issuance of an insurance policy, the insurance company must provide the insured with a copy of his application; the failure to do so precludes the insurance company from relying on misrepresentations in the application to void the policy.[4] When North Star informed Lipps of this section of Iowa Code, Lipps agreed that North Star should not have voided the policy; he had been unaware of the existence of § 515.133.

Pakala's lawyer demanded $350,000, which he alleged encompassed the full policy benefits plus interest, as well as extracontractual damages for bad faith, punitive damages, emotional distress, and attorney's fees. *See* Pl. App. 73-75.[5] He noted Pakala had been forced to drain his retirement account and take out a loan, and his home still had not been fully restored (the plumbing did not work in two bathrooms, the dishwasher, and two outdoor spigots; and the hot water did not work in one of the sinks). *Id.* Pakala's counsel rejected North Star's request to investigate, noting North Star waived its investigative rights under the policy when it purported to void the policy. *Id.* Pakala agreed to sit with Lipps for an examination, however. At the meeting, Lipps apologized to Pakala's attorney, acknowledging that Pakala had "been through hell" and that the claim should have been paid right away.

North Star paid Pakala $125,384.20 to cover the original loss amount ($114,615.15) plus interest ($10,769.05), and North Star and Pakala agreed to engage in mediation on the remainder of the claim. North Star reported the claim to its liability insurance carrier, NAMICO, which hired counsel and participated in the mediation. North Star informed Lipps that it would be seeking indemnity and contribution from him

---

[4] **Iowa Code §§ 515.133, 515.134**.

[5] "Pl. App." refers to the Plaintiff's Appendix, filed at Doc. 41-4.

based on his erroneous legal advice, but Lipps declined to participate in the mediation and settlement proceedings.

In early November 2019, Pakala's counsel submitted his statement of the case to the mediator, demanding $3.65 million in damages. Pl. App. 79-91. The statement outlined additional contractual damages Pakala incurred as the result of North Star's failure to timely pay on the policy: Pakala's policy covered living expenses while the house was uninhabitable (he had stayed with friends and family), and Pakala estimated repairs would have taken four months if handled by professionals (for $4,000 in living expenses, or $1,000 a month); Pakala drained his retirement account ($16,000) and borrowed from the bank ($37,913.50) to fund repairs himself; he converted the boiler heat to forced air to save money by performing some of the work himself, and it would cost $176,487 plus tax to convert back to historically accurate boiler heat (he attached a bid in this amount); and his house needed additional repairs (such as repairing drywall holes and new paint) as a result of the DIY[6] aspect of his work. *Id.* Pakala also indicated he sought $1-2 million in emotional-distress damages and $2-5 million in punitive damages. *Id.* A few days after sending this letter, Pakala increased his demand to $3.9 million because his mortgage company refused to release the money North Star had already provided until the house was restored to its original condition.

Although mediation in late November 2019 was unsuccessful, the parties continued their settlement talks. North Star initially offered $500,000, which was rejected. After some back-and-forth, North Star and Pakala settled all claims in December 2018 for $575,000 (on top of the money North Star had already paid). NAMICO and North Star attributed $329,000 of the settlement to extracontractual (bad faith) damages; NAMICO covered these damages less North Star's $100,000 deductible. The mediator indicated that his settlement range for the case was around $600,000; North Star's attorney also believed the $575,000 settlement was reasonable.

---

[6] Do it yourself.

North Star initiated this lawsuit against Lipps in September 2020, and the parties consented to the exercise of jurisdiction by a United States magistrate judge. Docs. 1, 14. North Star seeks $602,334.07 in damages: $234,400.50 in additional contractual damages owed to Pakala because of the delay in payment (based on what it would cost to revert the house back to boiler heat; and Pakala's incurred expenses in liquidating his retirement account, borrowing money, and living away from his home); $329,000 in bad-faith and punitive damages owed to Pakala;[7] $10,769.05 in interest on the original loss amount owed to Pakala; and $28,164.52 in NAMICO's attorney's fees in the underlying action.

Lipps moves for summary judgment, arguing that North Star cannot prove damages. Doc. 37. North Star filed a resistance (Doc. 41), and Lipps filed a reply (Doc. 44).

## II.    DISCUSSION

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant [a motion for] summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." For the plaintiff to avoid summary judgment, sufficient evidence must exist "on which the jury could reasonably find for the plaintiff.'"[8] The court "view[s] the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor."[9]

---

[7] I acknowledge that these numbers (for additional contractual damages and bad-faith and punitive damages) are slightly less than the settlement amount, totaling $563,400.50.

[8] *Olmsted v. Saint Paul Pub. Sch.*, 830 F.3d 824, 828 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

[9] *Soo Line R.R. Co. v. WernerEnters.*, 825 F.3d 413, 418 (8th Cir. 2016) (quoting *Bishop v. Glazier*, 723 F.3d 957, 960-61 (8th Cir. 2013)).

5

This diversity action involves a claim under Iowa state law. Federal courts are "bound by the decisions of the [Iowa] Supreme Court regarding issues of substantive state law."[10] "If the [Iowa] Supreme Court has not yet addressed a particular issue, '[the court] may consider relevant state precedent, analogous decisions, considered dicta, and any other reliable data.'"[11] "Decisions from [Iowa's] intermediate appellate court . . . are 'particularly relevant,' and must be followed when they are the best evidence of [Iowa] law."[12]

Lipps argues that North Star could have defended against a bad-faith claim based on Lipps's legal advice, and therefore, North Star cannot prove Lipps's liability for extracontractual damages. Lipps also argues that because North Star settled the case early, without obtaining documentation from Pakala that he liquidated his bank account and et cetera, North Star cannot prove that Pakala suffered additional contractual damages as a result of the delay in payment. Finally, Lipps argues North Star is not entitled to attorney's fees in the underlying action as a matter of Iowa law.[13] Lipps does not specifically challenge North Star's claim for interest on the original loss payment.

### A.   *Extracontractual Damages*

Pakala alleged millions of dollars in damages for emotional distress and punitive damages on the underlying claim. North Star attributes $329,000 of the settlement with Pakala to extracontractual (punitive and emotional-distress) damages.

Lipps argues that North Star cannot prove proximate cause for these damages.

The burden of proving proximate cause in a legal malpractice action is the same as any other negligence action. To recover, the injured party must

---

[10] ***Bockelman v. MCI Worldcom, Inc.***, 403 F.3d 528, 531 (8th Cir. 2005).

[11] ***Id.*** (cleaned up) (quoting ***Bass v. Gen. Motors Corp.***, 150 F.3d 842, 846-47 (8th Cir. 1998)).

[12] ***Id.*** (quoting ***Knouse v. Gen Am. Life. Ins. Co.***, 391 F.3d 907, 911-12 (8th Cir. 2004)).

[13] As Lipps notes, North Star's brief does not specifically respond to this argument. Nevertheless, I decline to find that North Star conceded the point.

show that, but for the attorney's negligence, the loss would not have occurred.[14]

Lipps argues that North Star's reliance on Lipps's (bad) advice would have precluded a finding in the underlying action that North Star acted in bad faith. In essence, Lipps argues that Pakala's bad-faith claim against North Star would have necessarily failed, limiting Pakala's recovery to contractual damages.

"Under Iowa law, a claim of bad faith requires the insured to prove: '(1) that the insurer had no reasonable basis for denying benefits under the policy; and (2) [that] the insurer knew, or had reason to know, that its denial was without basis.'"[15] "Whether the insurer had a reasonable basis for the denial of benefits is an objective inquiry; a reasonable basis for the denial of insurance benefits exists under the first element if the claim is 'fairly debatable,' i.e., if it is 'open to dispute on any logical basis.'"[16]

Here, Lipps suggests that his legal advice provided North Star with a reasonable basis to deny the claim. But "advice of counsel does not automatically establish good faith"; rather, "it is a factor to consider in determining whether a party acted in good or bad faith."[17] A statute (as well as caselaw interpreting that statute) make clear that North Star could not rely on the misrepresentations in Pakala's application to deny coverage, since North Star had not provided Pakala with a copy of that application when it issued the policy. This was not an area of unsettled law, or an area in which informed lawyers could entertain reasonable doubt, or an error in judgment on a new legal issue—as argued by Lipps. The law was clear. At the very least, it is an open question whether an advice-of-counsel defense would have been successful against Pakala's bad-faith claim.

---

[14] ***Blackhawk Bldg. Sys., Ltd. v. L. Firm of Aspelmeier, Fisch, Power, Warner & Engberg***, 428 N.W.2d 288, 290 (Iowa 1988).

[15] ***Merriam v. Nat'l Union Fire Ins. Co. of Pittsburgh***, 572 F.3d 579, 585 (8th Cir. 2009) (quoting ***Rodda v. Vermeer Mfg.***, 734 N.W.2d 480, 483 (Iowa 2007)).

[16] ***Id.*** (quoting ***Bellville v. Farm Bureau Mut. Ins. Co.***, 702 N.W.2d 468, 473 (Iowa 2005)).

[17] ***City of Riverdale v. Diercks***, 806 N.W.2d 643, 657 (Iowa 2011).

"In a legal malpractice context, . . . the general measure of damages is 'the amount of loss actually sustained as a proximate result of the conduct of the attorney.'"[18] For legal malpractice claims involving "negligently *defending* a prior case, . . . [t]he loss 'actually sustained' from the adverse judgment in the prior case is the amount of that judgment including costs."[19] Thus, as Lipps notes, proof of damages necessarily involves analysis of the value of the underlying cause of action. When litigants bring malpractice actions against their former lawyers, they must prove that absent the lawyer's negligence, they would have won the underlying lawsuit;[20] this is sometimes referred to as proving a "case-within-a-case."[21] But here, North Star does not allege that Lipps's mishandling of the underlying case resulted in North Star losing the case or having to pay a larger settlement than it would have otherwise; rather, North Star's damages come from the potential of being sued at all. North Star argues that but for Lipps's negligent opinion letter, it would not have voided the policy, and it would have paid Pakala's claim right away, thereby avoiding Pakala's claim for damages based on bad faith.

Under the circumstances, North Star can prove that Lipps is the proximate cause of its damages without proving that it would have lost the Pakala lawsuit. "[P]roving a case-within-a-case is not a hard-and-fast requirement" in legal malpractice actions.[22] When a plaintiff's damages are based on the attorney's negligent conduct in the underlying lawsuit causing the plaintiff to lose the underlying suit, then the case-within-a-case requirement makes sense: if the plaintiff would have lost the underlying case anyway, there is no causation between the lawyer's negligence and the plaintiff's loss. But here, even if North Star

---

[18] ***Beeck v. Aquaslide 'N' Dive Corp.***, 350 N.W.2d 149, 160 (Iowa 1984) (quoting 7A **C.J.S. Attorney & Client § 273a** (1980)).

[19] ***Pickens, Barnes & Abernathy v. Heasley***, 328 N.W.2d 524, 525–27 (Iowa 1983) (quoting 7 **Am. Jur. 2d** *Attorneys at Law* § 226 (1980)).

[20] ***Burke v. Roberson***, 417 N.W.2d 209, 211 (Iowa 1987).

[21] *See, e.g.*, ***Quad City Bank & Tr. v. Elderkin & Pirnie, P.L.C***, 870 N.W.2d 249, 253 (Iowa Ct. App. 2015).

[22] ***Gerber Prods. Co. v. Mitchell Williams Selig Gates & Woodyard, PLLC***, 28 F.4th 870, 873 (8th Cir. 2022) (applying Arkansas law); *see also* **Restatement (Third) of the Law Governing Lawyers** § 53 cmt. e & rptr.'s note to cmt. e (Am. L. Inst. 2000) (Westlaw, May 2022 update).

had taken Pakala's case to trial and ultimately prevailed, North Star would still have incurred damages in having to face the case at all.

Lipps declined to participate in the underlying settlement negotiations. North Star chose to settle rather than litigate the potential claims for bad faith and punitive damages. In the subrogation context, the Iowa Supreme Court has held that an insurance company may recover damages based on its reasonable settlement with the insured:

> [In determining reasonableness, t]he court considers "facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial." The insured need not establish actual liability to the party with whom it has settled. Instead, the insured need only show a *potential* liability, as supported by the evidence that culminated in a settlement that is reasonable in view of the size of the possible recovery and likelihood that liability would be established.[23]

Similarly, here, North Star can recover damages based on its settlement with Pakala. "The Iowa Supreme Court has . . . recognized [intentional infliction of emotional distress] claims against insurers for refusal to pay benefits."[24] And punitive damages are available for bad-faith claims when the insured proves the defendant acted with "willful and wanton disregard for the rights . . . of another."[25] Although Lipps argues that his advice would have precluded a finding in the underlying action that North Star acted willfully and wantonly, North Star does not necessarily need to prove that Pakala would have been successful in obtaining punitive damages in the underlying action—this fact may be relevant to the reasonableness of the settlement, but North Star's damages here come

---

[23] **Metro. Prop. & Cas. Ins. Co. v. Auto-Owners Mut. Ins. Co.**, 924 N.W.2d 833, 845 (Iowa 2019) (quoting **Red Giant Oil Co. v. Lawlor**, 528 N.W.2d 524, 535 (Iowa 1995)).

[24] **Schuller v. Great-W. Life & Annuity Ins. Co.**, No. C-04-62-LRR, 2005 WL 2259993, at *18 (N.D. Iowa Sept. 15, 2005) (citing **Amsden v. Grinnell Mut. Reins. Co.**, 203 N.W.2d 252, 253 (Iowa 1972)); *see also* **Miranda v. Said**, 836 N.W.2d 8, 19 n.8 (Iowa 2013) (noting that court in *Amsden* had "suggested breach of a contractual duty might otherwise be a sufficient basis for awarding damages for emotional distress" if insurance company's conduct was extreme or outrageous).

[25] **Iowa Code § 668A.1(1)**.

9

from the threat of facing punitive damages at all. North Star has offered evidence that it would not have defended against Pakala's lawsuit (and incurred the costs to settle it) absent Lipps's opinion letter. Under the circumstances, the jury may find that North Star's actual loss from Lipps's advice includes the reasonable amount to settle Pakala's punitive-damages and emotional-distress claims.[26]

Where, as here, North Star has offered evidence that Lipps's legal advice exposed North Star to liability it would not have faced otherwise, it is for the jury to determine whether North Star reasonably settled the claim. A genuine issue of material fact exists whether Lipps's advice caused North Star's damages in settling Pakala's claim.

## B. Additional Contractual Damages Incurred Due to Delay in Payment

North Star attributes $234,400.50 of the settlement to additional contractual damages owed to Pakala because of the delay in payment (based on what it would cost to revert the house back to boiler heat; and Pakala's incurred expenses in liquidating his retirement account, borrowing money, and living away from his home). Lipps argues that North Star has offered only "speculative" evidence of these damages. Lipps suggests that because Pakala did not have to prove his claim at trial, North Star cannot prove now that Pakala actually suffered the damages he claimed during the mediation.

The Iowa Supreme Court has recognized:

> There is a distinction between proof that a party has suffered damages and proof regarding the amount of those damages. If the record is uncertain and speculative whether a party has sustained damages, the fact finder must deny recovery. But if the uncertainty is only in the amount of damages, a fact finder may allow recovery provided there is a reasonable basis in the

---

[26] See *Union Planters Bank, N.A. v. Thompson Coburn LLP*, 935 N.E.2d 998, 1022-23 (Ill. App. Ct. 2010) (Illinois law) (holding that when a lawyer failed "to advise a client of the foreseeable risks attendant to a given course of legal action," exposing the client "to risk that the client did not knowingly and voluntarily assume," client could recover reasonable costs in settling and defending the resulting lawsuits against it (quoting *Metrick v. Chatz*, 639 N.E.2d 198, 201 (Ill. App. Ct. 1994))).

evidence from which the fact finder could infer or approximate the damages.[27]

Lipps conflates this standard. Here, North Star has offered sufficient proof of its damages based on the cost to settle Pakala's lawsuit; opinions that this settlement was reasonable; evidence of the amount of the settlement apportioned between NAMICO (responsible for bad-faith damages) and North Star (responsible for additional contract damages based on the delay in payment); and Pakala's statement outlining his damages to the mediator, including evidence of the cost to re-install boiler heat in his house (as the house used before North Star denied Pakala's claim). Lipps points to deposition testimony from NAMICO and North Star representatives involved in the settlement negotiations, in which they recognized generally that water damage may worsen with time and that they apportioned damages between NAMICO and North Star based on a reasonableness standard, rather than a purely scientific method. Def. App. 41-43, 54-56. Read in context, this is not the smoking gun Lipps makes it out to be.

As discussed in the prior section, North Star has offered evidence that Lipps's opinion letter caused it to incur damages in settling Pakala's lawsuit. It will be for the jury to determine whether those damages were reasonable and therefore proximately caused by Lipps's negligence.

### C. Corrective Attorney's Fees

Lipps argues that North Star cannot recover attorney's fees incurred in settling the underlying action, citing generally to the American Rule that each party bears its own attorney's fees absent an applicable statute or contract.[28] But North Star does not seek to recover its attorney's fees incurred in prosecuting this action; rather, North Star seeks its attorney's fees in settling Pakala's underlying claim against it. North Star's theory is that

---

[27] *Crookham v. Riley*, 584 N.W.2d 258, 266 (Iowa 1998).

[28] *Miller v. Rohling*, 720 N.W.2d 562, 573 (Iowa 2006).

absent Lipps's erroneous advice about voiding Pakala's policy, North Star would have paid out on Pakala's claim in early 2018, thus avoiding the need for settlement negotiations on Pakala's additional contractual damages and bad-faith claim (as well as avoiding the related attorney's fees). Allowing North Star to recover its underlying attorney's fees would comport with the general "goal in [a] legal malpractice suit[] . . . to put clients in the position they would have occupied had the attorney not been negligent."[29]

The Iowa Court of Appeals recognized in 2015 that Iowa courts had not yet "affirmatively held that attorney fees from the underlying case are recoverable in a malpractice action."[30] Nevertheless, the court noted that the Iowa Supreme Court had shown openness to such damages.[31] The court held that a plaintiff in a malpractice action can recover the attorney's fees it paid to the defendant lawyer in the underlying action for work that did not benefit the plaintiff.[32]

Similarly, a federal judge in the Southern District of Iowa, relying on *Quad City*, held that the defendant in a malpractice action could only recover on its counterclaim for attorney's fees if its legal work benefitted the plaintiff.[33] The court suggested agreement with the plaintiff's argument "that it should not have to pay for services that it would not have needed if [defendant lawyer] had fully informed [plaintiff] of the consequences of [an action plaintiff ultimately took] and [plaintiff] had chosen a different route."[34]

Although not directly on point, I find these cases demonstrate that Iowa courts would allow recovery of the attorney's fees that North Star seeks here. In addition,

---

[29] *Sladek v. K Mart Corp.*, 493 N.W.2d 838, 840 (Iowa 1992).

[30] *Quad City*, 870 N.W.2d at 260.

[31] *Id.* at 259-60 (citing *Hook v. Trevino*, 839 N.W.2d 434, 446-48 (Iowa 2013)).

[32] *Id.* at 252, 259, 261-62.

[33] *Est. of West ex rel. West v. Domina L. Grp., PC*, No. 1:16-cv-30-HCA, 2018 WL 3454904, at *13-14 (S.D. Iowa May 1, 2018).

[34] *Id.* at *14.

allowing North Star to recover its attorney's fees would be in accord with the majority of courts that have addressed the issue and held that a malpractice plaintiff is entitled to recover "corrective attorney's fees," described "as money paid to new counsel [in the underlying action] 'to correct the problem caused by the negligent lawyer.'"[35]

Lipps is not entitled to summary judgment on North Star's damages claim for its attorney's fees incurred settling the underlying claim.

### III.    CONCLUSION

The court **denies** Lipps's motion for summary judgment (Doc. 37).

**SO ORDERED** on September 12, 2022.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[35] *Gerber Prod. Co. v. Mitchell Williams Selig Gates & Woodyard, PLLC*, 28 F.4th at 872073 (quoting *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998)).

13